IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:13-cr-00018 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CASEY GLENN ALCORN, | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

On January 19, 2013, police officers with the Martinsville Police Department arrested Defendant Casey Glenn Alcorn ("Defendant"). In the Indictment filed in this Court on July 2, 2013, Defendant was charged with one count of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1) [*see* ECF No. 13]. Defendant filed a Motion to Suppress on November 25, 2013, arguing that the evidence against him was obtained in violation of the Fourth Amendment [ECF No. 25]. On December 16, 2013, I held an evidentiary hearing on Defendant's Motion. After careful review and consideration, and for the reasons stated below, I will **DENY** Defendant's Motion to Suppress. Although Defendant had a reasonable expectation of privacy, I find that the police conduct at issue did not violate the Fourth Amendment.

I. FINDINGS OF FACT AND PROCEDURAL HISTORY

After hearing arguments from counsel and testimony from the arresting officers and Defendant's wife, Ms. Delberia Bradley-Alcorn, I find as follows:

On January 19, 2013, Sergeants Robert Jones and Chad Rhoads of the Martinsville Police Department responded to a call regarding a disturbance in the parking lot of an apartment

complex located at 807 Barrows Mill Road in Martinsville, Virginia.[1] (Def.'s Mot. to Suppress 1 [ECF No. 25] (hereinafter "Def.'s Mot."); Resp. in Opp'n to Def.'s Mot. to Suppress 1 [ECF No. 31] (hereinafter "Resp. in Opp'n").) The officers found no disturbance in the parking lot upon arrival, and proceeded to walk around the perimeter of the apartment complex twice. (Def.'s Mot. 1; Resp. in Opp'n 1.) As they returned to their cars, the officers heard "loud, muffled voices" coming from one of the five apartments in the building. (Def.'s Mot. 1.) Sergeant Jones approached the front door to investigate, and "someone opened the door and then slammed it closed and locked it." (*Id.*) Sergeant Jones knocked at the entrance, and Defendant's wife, Delberia Bradley-Alcorn, opened the door.[2] (Def.'s Mot. 1; Resp. in Opp'n 2.)

When Ms. Bradley-Alcorn answered the door, she yelled, "He stole my phone! He stole my phone!" (referring to Defendant) and swung the door all the way open. Defendant, who was standing in or near the living room, took off running toward the rear entrance of the apartment.[3]

---

[1] According to testimony adduced at the hearing, Defendant was no longer a full-time resident of the Martinsville apartment. Although he had previously lived there full-time, Defendant and his wife were undergoing a period of temporary separation while they worked to re-establish their relationship. Despite the separation, Ms. Bradley-Alcorn testified that Defendant was staying in the apartment, which was listed in her name, approximately three to four nights a week. Defendant had his own key, and at least some of his belongings remained in the apartment. Ms. Bradley-Alcorn indicated that the couple had been separated for approximately one month at the time of the incident. Defendant was staying in the apartment on the night in question, but also maintained another residence at 309 Grayson Street.

[2] On this point, Defendant contradicts his own witness. While he states in his Motion to Suppress that an officer "approached the apartment and someone opened the door and then slammed it closed and locked it," (Def.'s Mot. 1), Ms. Bradley-Alcorn testified that no one opened the door until Sergeant Jones knocked at the entrance. She explained that they had been expecting a guest that evening, and were surprised to see a police officer when she opened the door. According to her, Defendant was in the bathroom when officers arrived, and did not emerge until the moment Sergeant Jones was standing in the front doorway.

[3] Ms. Bradley-Alcorn recounted a different version of events. She testified that Defendant had spent eighteen days in the hospital due to a four wheeler accident, and could not run or move around easily. She claims that she did not say anything to the police when she opened the door, and Sergeant Jones simply rushed past her–without her consent to enter–to go after Defendant. It was only when officers removed her cell phone from Defendant's pockets, she argues, that she remembered he was holding it for her and became concerned that the phone might end up in an evidence lock-up, at which point she claims

(Def.'s Mot. 1; Resp. in Opp'n 2.) Sergeant Jones immediately entered the residence, apprehended Defendant, and placed him under arrest.[4] (Def.'s Mot. 1–2; Resp. in Opp'n 2.) Meanwhile, Sergeant Rhoads circled around the apartment to approach the rear entrance from the outside. (Def.'s Mot. 2; Resp. in Opp'n 2.) Sergeant Rhoads heard, but could not see, Sergeant Jones engaged in a struggle inside the apartment. Finding the back door unlocked, Sergeant Rhoads entered the residence to assist Sergeant Jones. (Def.'s Mot. 2; Resp. in Opp'n 2.)

After placing Defendant in handcuffs, Sergeant Jones searched his person and found some marijuana, a .45 caliber magazine containing ammunition, and a cell phone belonging to Ms. Bradley-Alcorn in Defendant's front pants pocket. (Def.'s Mot. 2; Resp. in Opp'n 2–3.) Sergeant Jones removed Defendant from the apartment while Sergeant Rhoads remained to take a statement from Ms. Bradley-Alcorn. (Def.'s Mot. 2; Resp. in Opp'n 3.) Once Defendant and Sergeant Jones were out of the apartment, Ms. Bradley-Alcorn gestured with her eyes and forehead toward the living room sofa, prompting Sergeant Rhoads to search and discover a firearm located behind the sofa in the gap between the sofa and the wall.[5] (Resp. in Opp'n 3.)

---

to have informed the officers, "That's my phone! That's my phone!" She testified that she never claimed it was stolen.

[4] Sergeant Jones testified that he initially arrested Defendant for obstruction of justice, on the grounds that the officers had to physically restrain and struggle with him in order to get his hands behind his back. Sergeant Jones also testified that he *could* have relied on the alleged theft of the cell phone as a basis for the arrest, but did not indicate that he necessarily relied on it at the time.

[5] Ms. Bradley-Alcorn disputes the officers' testimony on this point as well, and claims that the firearm belonged to her. According to her testimony, Ms. Bradley-Alcorn purchased it for approximately $200-250 dollars in cash from an unknown individual at a Sheetz gas station in North Carolina. When questioned about the identity of the seller, she responded that she did not recall who sold her the firearm, and testified that "a cousin or someone" had put her in touch with the seller. She kept the firearm in several locations throughout the house, according to her, and had placed it behind the sofa herself. She further testified that earlier in the night she had been outside in the parking lot with Defendant, and the magazine had been in her purse along with her cell phone. She claims that after her purse ripped and spilled its contents out onto the ground, they put the cell phone and magazine in Defendant's pocket. At the hearing, I asked if the marijuana was also hers, and she replied that it was not. Ms. Bradley-Alcorn denies ever gesturing toward the sofa. She claims that after the officers removed Defendant from the

Ms. Bradley-Alcorn told Sergeant Jones that Defendant had thrown the firearm behind the sofa when the officers approached the apartment. The officers confirmed that the magazine and ammunition recovered from Defendant's pocket fit the firearm found behind the sofa.

On June 7, 2013, the government filed a Complaint against Defendant in this Court. (*See* Compl.) In the Indictment, filed July 2, 2013, the government alleged that he "did knowingly and unlawfully possess a firearm . . . and ammunition . . . in and affecting interstate or foreign commerce." (Indict. 1.) Defendant was charged with one count of violating 18 U.S.C. § 922(g)(1). (*Id.*) On November 25, 2013, Defendant filed a Motion to Suppress, arguing that the evidence against him was obtained in violation of the Fourth Amendment. (*See* Def.'s Mot. 3.) Both sides have filed written briefs, and on December 16, 2013, I held an evidentiary hearing on Defendant's Motion. The matter is now ripe for review.

## II.   STANDARD OF REVIEW

When examining a Fourth Amendment claim, a court must first determine whether the defendant "had a reasonable expectation of privacy in the area searched or the item seized." *United States v. Rusher*, 966 F.2d 868, 873–74 (4th Cir. 1992) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980); *Rakas v. Illinois*, 439 U.S. 128, 140–50 (1978)). The defendant bears the burden of proving that he has a reasonable expectation of privacy. *See United States v. Ramapuram*, 632 F.2d 1149, 1154 (4th Cir. 1980). If the defendant "manifested a subjective expectation of privacy . . . that society accepts as objectively reasonable," then his claims fall within the ambit of the Fourth Amendment. *California v. Greenwood*, 486 U.S. 35, 39 (1988).

---

apartment, one of them came back in, picked up something from behind the sofa, and placed it in a bag. According to her testimony, one of the officers asked for her name, social security number, and other information, but they never discussed the firearm.

The Fourth Amendment requires that the police have a search warrant, exigent circumstances, or some other recognized, constitutionally permissible justification for their presence in or on the defendant's home or protected property. *See* U.S. Const. amend. IV (guaranteeing "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches or seizures . . . ."). If the defendant has a reasonable expectation of privacy in a particular item or area, and thus may invoke the protection of the Fourth Amendment, a court must then determine the reasonableness of any search or seizure. *See Rusher*, 966 F.2d at 874.

If the government argues that a search was consensual, it must demonstrate that consent was voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). In order to demonstrate that consent was "voluntary," the government is not required to establish that it was knowing and intelligent (although these are factors that a court may properly consider), but only that it was "not the result of duress or coercion, express or implied." *Id.* at 249. "[M]ere acquiescence to lawful authority" cannot validate a warrantless search. *United States v. Ocampo*, 492 F. Supp. 1211, 1236 (E.D.N.Y. 1980) (citing *Schneckloth*, 412 U.S. at 222, 228–29). The question of whether consent to a search was voluntary is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 248–49.

### III. <u>DISCUSSION</u>

Defendant moves to suppress the evidence against him on the grounds it was obtained as the result of a search and seizure which violated his constitutional rights. As a preliminary matter, I must first determine whether Defendant had a reasonable expectation of privacy in the Martinsville apartment and the items that were searched or seized. If Defendant is able to

properly invoke the Fourth Amendment, there are at least four significant issues that may affect the ultimate admissibility of the evidence against him. These issues include: (1) whether the police lawfully entered the apartment without a warrant; (2) whether the police lawfully seized Defendant's person once inside the apartment; (3) whether the police lawfully searched Defendant's person incident to arrest, and seized the ammunition in his pocket; and (4) whether the police lawfully seized the firearm once Defendant was removed from the apartment. Accordingly, I will address each of these issues in turn.

### A. *Standing to Invoke the Fourth Amendment*

The touchstone of Fourth Amendment analysis is the question of "whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz v. United States*, 399 U.S. 347, 360 (1967) (Harlan, J., concurring)). In this case, the issue of standing is somewhat complicated by the fact that Defendant likely enjoyed a status vis-à-vis the apartment that was less than that of a co-owner or co-tenant. The government argues that Defendant lacks standing to raise claims under the Fourth Amendment because "he was not a full-time resident of the apartment." (Resp. in Opp'n 4.)

The Fourth Amendment, however, protects individuals living in a large number of legal arrangements. For example, "the Amendment safeguards the privacy interests of owners, boarders, and tenants of a home, apartment or other dwelling place." *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (citations omitted). "Co-tenants, co-owners, and co-occupants," as well as travelers in their hotel and motel rooms, are entitled to avail themselves of the same protections. *Id.* (citations omitted). Moreover, an individual "may have a legitimate expectation of privacy in the house of someone else." *Id.* (citations omitted). As the Supreme Court has

long recognized, "the relatives of home owners who regularly reside at the residence are protected by the Fourth Amendment," and, "more recently, the Supreme Court extended the Fourth Amendment's privacy protections to overnight guests." *Id.* (citations omitted).

Defendant's conduct on the night in question manifested an "actual (subjective) expectation of privacy,"[6] *see Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), but the operative question is whether this expectation is one that society regards as objectively reasonable. At the time of his arrest, Defendant and Ms. Bradley-Alcorn were legally married and working through a roughly one-month period of temporary separation. While the apartment was in her name, Defendant had his own key and had previously lived in the residence full-time. His belongings remained in the apartment, and even during the period of separation, Defendant stayed overnight approximately three to four nights a week.

Defendant's status is perhaps most accurately characterized as straddling the line between co-occupant and an overnight guest. At the very least, he was lawfully in the apartment as an overnight guest on the night in question. In light of the above body of Fourth Amendment precedent, I find that Defendant therefore had a constitutionally protected reasonable expectation of privacy. Accordingly, he has standing to invoke the protections of the Fourth Amendment, and may properly challenge the lawfulness of any related search or seizure. For the remainder of the analysis, I will assume that Defendant and Ms. Bradley-Alcorn co-inhabited the apartment. *See United States v. Hylton*, 349 F.3d 781, 783–85 (4th Cir. 2003) (making a similar assumption for purposes of discussion on similar facts).

---

[6] Defendant was arrested inside of the apartment, and the items which were seized were hidden from view, either behind the sofa or located on Defendant's person. From his perspective, there was no reason to believe that these items would not remain private and in Defendant's exclusive possession.

### B. Warrantless Entry into the Apartment

It is well-settled law that "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). These exceptions, however, "must be narrow and well-delineated in order to retain their constitutional character." *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)). Generally, it is unreasonable for police officers to enter the home without consent, a warrant, or exigent circumstances to justify the intrusion. *See, e.g.*, *Steagald v. United States*, 451 U.S. 204, 211–12 (1981). Searches of the home are particularly significant, as "the Fourth Amendment has drawn a firm line at the entrance to the house," and "[a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980).

Defendant argues that the police did not have consent to enter the apartment, while the government counters that Ms. Bradley-Alcorn provided implied consent through her actions and statements. (Def.'s Mot. 1–2; Resp. in Opp'n 3.) The Fourth Circuit has previously held that "[c]onsent may be inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) (citing *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir. 1990); *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000); *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir. 1981)). In *United States v. Hylton*, the Fourth Circuit also recognized that "valid consent may be given by any one of the co-habitants of a premises, even though no other co-habitant has consented." 349 F.3d at 785. Further, "when a tenant expresses fear about

a dangerous condition in her apartment and calls the police for assistance, it can be inferred that she is authorizing them to diffuse the dangerous condition." *Id.* at 786.

While Ms. Bradley-Alcorn had the authority to provide implied consent through her words and actions, determining whether she actually did so in this case requires that I resolve a disputed issue of fact. Since the testimony of Sergeants Jones and Rhoads concerning their entry into the apartment is virtually irreconcilable with that of Ms. Bradley-Alcorn, the question of implied consent turns in large part on the relative credibility of the witnesses' testimony. Both officers testified that the front door opened, and then closed again, before it was opened by Ms. Bradley-Alcorn. At the hearing, she flatly denied that claim.[7] Further, Sergeant Jones testified that Ms. Bradley-Alcorn yelled, "He stole my phone! He stole my phone!" when speaking with Sergeant Jones at the front door. She claims that she did not, and argues that Sergeant Jones nearly knocked her over as he rushed into the apartment toward Defendant (whom he was seeing for the first time, since Defendant had not previously opened the door by her account, and was just emerging from the bathroom).

I find the testimony of Ms. Bradley-Alcorn to be almost wholly incredible. In order to credit her version of events, I would have to accept a level of situational awareness on the part of the officers that borders on prescience. According to Ms. Bradley-Alcorn, despite not having any knowledge of who was in the apartment prior to knocking, Sergeant Jones knocked on her door and then wordlessly rushed past her in order to apprehend the injured man emerging from the bathroom. As the other officer came in through the back door, according to Ms. Bradley-Alcorn, they began pulling things out of Defendant's pockets that belonged to her. After removing Defendant from the apartment, I would have to believe that Sergeant Rhoads returned

---

[7] Again, her testimony in this regard contradicts not only the sworn statements of Sergeants Jones and Rhoads, but also the statement of facts contained in Defendant's Motion to Suppress. (Def.'s Mot. 1.)

and, despite having no prior knowledge or indication of its location, headed directly for the firearm that Ms. Bradley-Alcorn had deliberately stored in the gap behind the sofa.[8] Although (and perhaps in part *because*) the account provided by Ms. Bradley-Alcorn would seem to neatly exculpate her husband from all wrongdoing, while shielding everyone else from any potential liability, I am not persuaded of its veracity. Instead, I find the testimony of Sergeants Jones and Rhoads concerning Ms. Bradley-Alcorn's statements and the officers' entry into the apartment to provide a more reliable account of events.

Ultimately, I find that Ms. Bradley-Alcorn voluntarily provided implied consent for officers to enter the apartment by swinging the door open and loudly accusing the individual inside of stealing her cell phone. Unlike the circumstances presented by *Georgia v. Randolph*, 547 U.S. 103 (2006), there was no express objection from a physically present co-occupant that might negate the other's consent to a search. Rather than object, Defendant fled. Seeing that the individual was attempting to flee, the officers acted reasonably by entering the residence in order to address the situation. Accordingly, pursuant to the Fourth Circuit's holding in *United States v. Hylton*, 349 F.3d 781, 785 (4th Cir. 2003), the police officers' warrantless entry did not violate the Fourth Amendment. Having found implied consent sufficient to justify the officers' warrantless entry, there is no need to address the alternative theories supplied by the government, *i.e.*, that entry was justified by exigent circumstances.

---

[8] Ms. Bradley-Alcorn testified that the firearm belonged to her (after purchasing it from an unknown party that she met through an unknown relative), and that she had deliberately stored it behind the sofa. While this would seem to suggest that she was aware of its location at the time, she also testified that when Sergeant Rhoads came back, he placed "an item from behind her sofa" in a bag, and then the two never discussed it during their subsequent conversation. Since Ms. Bradley-Alcorn testified that she was very concerned about her cell phone going into an evidence lock-up, I am somewhat perplexed by her seeming nonchalance concerning the fate of her firearm. At the very least, it appears that she would be aware of what Sergeant Rhoads might discover during a search of the space behind her sofa. There is no indication, however, that she ever informed police that the firearm belonged to her at the time of arrest.

### C. *Seizure of the Defendant and Subsequent Searches*

Apart from warrantless entry into the apartment, "the warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable." *Payton v. New York*, 445 U.S. 573, 585 (1980) (citations omitted). In order to assess probable cause in the context of an arrest, the relevant question "is whether the totality of the circumstances indicate to a reasonable person that a 'suspect has committed, is committing, or is about to commit' a crime." *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . . , though the arresting officer need not have in hand evidence which would suffice to convict." *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (citations omitted). Further, "[b]ecause a search incident to arrest is permitted only when there is a valid arrest, the validity of the arrest cannot depend on evidence found during the search." *United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996).

Defendant argues that the officers lacked probable cause to believe that a crime was being committed. (Def.'s Mot. 2.) If it were only Defendant's unprovoked flight at issue, I might be inclined to agree. The Supreme Court has discussed the significance of unprovoked flight, and noted that it "is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (discussing reasonable suspicion in the context of an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968)). It is true that when a police officer, "without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id.* at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). It is also true that "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention

or seizure." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). In *Wardlow*, however, the Court noted that "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.* On the other hand, "unprovoked flight, without more, can not elevate reasonable suspicion to detain and investigate into the probable cause required for an arrest." *United States v. Navedo*, 694 F.3d 463, 474 (3d Cir. 2012).

In this case, there was probable cause to arrest Defendant. The officers were called to the apartment complex regarding a disturbance, and heard shouting coming from Ms. Bradley-Alcorn's residence. After Sergeant Jones knocked on the door, Ms. Bradley-Alcorn yelled that Defendant had stolen her cell phone, while Defendant simply took off running. This unprovoked flight, coupled with Ms. Bradley-Alcorn's clear accusation of criminal conduct, led Sergeant Jones to reasonably conclude that Defendant had committed a crime. In light of the totality of these circumstances, I find that Defendant's arrest did not violate the Fourth Amendment.

Finally, although the Indictment only charged Defendant with one count of possessing "a firearm . . . and ammunition," these two items present separate and discrete issues under the Fourth Amendment.[9] With respect to the ammunition found in Defendant's pocket, it is well-established that "when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime." *Preston v. United States*, 376 U.S. 364, 367 (1964) (citations omitted). Further, while "the validity of the arrest cannot depend on evidence found during the search," *United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996), the Fourth

---

[9] The magazine containing the ammunition was found on Defendant's person during a search conducted incident to arrest, while the firearm was located behind the sofa in the apartment and was not discovered until Defendant had already been removed from the apartment. These circumstances implicate different sets of concerns and lines of reasoning under the Fourth Amendment.

Amendment does not require that the arrest actually *precede* the search. "A search may be incident to a *subsequent* arrest if the officers have probable cause to arrest *before* the search." *Id.* (citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)) (emphasis added).

In conjunction with a valid arrest, the officers were entitled to search Defendant's person for weapons and the fruits or implements of his alleged crime. The search was confined to the appropriate scope, *see Arizona v. Gant*, 556 U.S. 332, 339 (2009) (the scope of a search incident to arrest must be "commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest"), and conformed to both the temporal and geographic limitations prescribed by law, *see United States v. Currence*, 446 F.3d 554, 557 (4th Cir. 2006) (noting that a search incident to arrest must be confined to the area within the arrestee's immediate control and substantially contemporaneous with the arrest). I therefore find that the search of Defendant's person and subsequent seizure of the ammunition were justified as a lawful search incident to arrest. Accordingly, the officers' conduct did not violate the strictures of the Fourth Amendment.

With respect to the firearm discovered behind the sofa, the evidence compels a similar conclusion. It was located in an area of the apartment over which Ms. Bradley-Alcorn possessed common authority, and was recovered upon her own urging and direction.[10] While the "Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects," the "prohibition does not apply . . . to situations in which voluntary consent has been obtained . . . from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted).

---

[10] Again, I find the testimony of Sergeants Jones and Rhoads to be more credible than that of Ms. Bradley-Alcorn with respect to the firearm found behind the sofa. Once Defendant was removed from the apartment, Ms. Bradley-Alcorn gestured toward the sofa with her eyes and forehead. After Sergeant Rhoads discovered the firearm, Ms. Bradley-Alcorn indicated that Defendant had thrown it behind the sofa as police approached the apartment.

Accordingly, the seizure of the firearm from the apartment did not violate the Fourth Amendment.

## IV.  **CONCLUSION**

Defendant had a constitutionally protected reasonable expectation of privacy in the Martinsville apartment.  After Ms. Bradley-Alcorn provided the officers with implied consent to enter, however, Sergeants Jones and Rhoads lawfully entered the residence without a warrant.  Ms. Bradley-Alcorn's statements to the officers, in conjunction with Defendant's unprovoked flight at the sight of the police, provided probable cause sufficient to justify the arrest.  Once the officers effectuated a valid arrest, they acted within the confines of the law by searching Defendant's person incident to arrest.  Sergeant Rhoads, acting upon the consent and guidance of Ms. Bradley-Alcorn, lawfully seized the firearm from behind the sofa.  Accordingly, I find no violation of the Fourth Amendment, and I will therefore **DENY** Defendant's Motion to Suppress.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 13th day of January, 2014.

s/Jackson L. Kiser  
SENIOR UNITED STATES DISTRICT JUDGE